Johnson, J.
(dissenting.) — This cause comes up on appeal from the circuit court of South Carolina, acting in the capacity of an instance court of admiralty. The doctrines which regulated the decision of the circuit court are not overruled by a majority of the bench ; but the decree of that court is rescinded, because to three of the five judges who concur in sustaining the appeal, it appears, that the property could not be condemned in the court of St. Domingo, while lying in a neutral port; and to the other two, that the capture on the high seas, for a breach of municipal regulation, was contrary to the law of nations, and therefore, vested no jurisdiction in the court of St. Domingo. On the former doctrine, it is not ^necessary to make any observations, because in the case of the Sea Flower, argued together with this as one cause, and decided on the same day, that [*282 *168 doctrine is expressly overruled. But on the latter point, I think it proper, briefly to state the reasons upon which I found my disappropriation, both of the doctrine and of its application to this case.
It would have been some relief to us, in determining this question, had it been made a point by counsel, either in their argument in this court, or in the court below ; but it appears to have been wholly unnoticed by them. Most of the difficulties which have occurred in the investigation of this case, appear to have resulted from an indistinct view of the nature, origin and object of prize courts. Conducted by the same forms, and very generally blended in the same persons, it is not easy to trace upon the mind, the discriminating line between the instance and prize courts ; yet the object of the institution of the latter court, when considered, strongly marks the distinguishing point between them. In its ordinary jurisdiction, the admiralty takes cognisance of mere questions of meum and tuum arising between individuals ; its extraordinary or prize jurisdiction is vested in it for the purpose of revising the acts of the sovereign himself, performed through the agency of his officers or subjects. A seizure on the high seas by an unauthorized individual is a mere trespass, and produces no change of right, but such a seizure made by sovereign authority, vests the thing seized in the sovereign ; for the fact of possession must have all the beneficial effects of the right of possession, as the justice or propriety of it cannot be inquired into by the courts of other nations. But as this principle might leave the unoffending individual a prey to the rapacity of cruisers, or a victim to the errors of those who even mean well, and as every civilized nation pretends to the character of justice and moderation, and to have an interest in preserving the peace of the world, they constitute courts with powers to inquire into the correctness of captures made under color of their own authority, and to give redress to those who have been unmeritedly attacked or injured. , These are denominated prize courts, and the primary *object of their ' -* institution is, to inquire whether a taking as prize is sanctioned by the authority of their sovereign, or the unauthorized act of an individual. From this, it would seem to follow, that the decision of such a court is the only legal organ of communication through which the sanction of a sovereign can be ascertained, and that no other court is at liberty to deny the existence of sovereign authority for a seizure, which a prize court has declared to be the act of its sovereign.
The propriety of such an act may correctly become the subject of executive or diplomatic discussion ; but the equality of nations forbids that the conduct of one sovereign, or the correctness of the principles upon which he acts, should be submitted to the jurisdiction of the courts of another. From these considerations, I infer, that the capture and continued possession of The Sarah and her cargo, confirmed by the approbatory sentence of a court of the capturing power, vested a title in the claimant, which this court cannot, consistently with the law of nations, interpose its authority to defeat.
Having briefly stated the grounds upon which I originally formed, and now adhere to, an opinion in favor of the claimants, I will consider the objections stated to the jurisdiction of the court, on the ground that the seizure was contrary to the law of nations.
It is admitted, if the court of St. Domingo had jurisdiction of the subject-matter, that the condemnation completed the divestiture of property. *169 But it is contended, that the subject, in this case, was not within their jurisdiction, because it was seized for a cause not sanctioned by the law of nations. I am unfortunate enough to think, that neither the premises nor the conclusion of this argument are maintainable. The conclusion is subject to this very obvious objection, that it defeats the very end for which such courts were created. To contend, that a violation of the law of nations will take away the jurisdiction of a court, which sits and judges according to the law of nations, appears to approach very near to a solecism. The occurrence which gives it jurisdiction, takes it away.
*If the object and end of constituting a prize court be to give re- r*284 dress against unlawful capture, and, as the books say, in such case, to *- restore velis levatis, how can it make reparation to the injured individual, if it loses its jurisdiction ; because there has been an injury done to him, the court can give him no redress. The argument admits, that a capture, consistent with the law of nations, would give jurisdiction, but how is the legality or illegality of a capture to be determined, unless a court can take jurisdiction of the case. The legality of the capture is the very point to which a court is to direct its inquiries, and yet that inquiry is arrested in its inception. The cause or circumstances of a capture can never be known to a court, without exercising jurisdiction on the subject. To maintain, therefore, that prize courts can only exercise jurisdiction over captures, made consistently with the laws of nations is, in effect, to deprive them of all jurisdiction, since it leaves no means of deciding the question on which their jurisdiction rests.
But the premises which lead to this conclusion, will be found no less exceptionable than the conclusion itself; and the propriety of taking into consideration the questions which form those premises, very questionable. The opinion of those of my brethren who maintain this doctrine, is founded upon two propositions. 1. That a nation cannot capture, on the high seas, a vessel which has, within her territories, committed a breach of a municipal law. 2. That the condemnation in this ease was grounded on an offence against a municipal law.
To me it appears wholly immaterial, on what grounds the decision be founded, if the case be within their jurisdiction. Indeed, this is fully admitted by those of the court, who maintain the doctrine that I am considering ; but under the idea of examining the jurisdiction of the court, they appear to me to go further, and examine into the correctness of its decision. I do not deny, that there are circumstances material to the effect of sentences of foreign prize courts, into which other courts may *in- r*2gg quire. The authorities quoted on this point relate exclusively to two, *- viz : 1. Whether the court is held in the territory of the sovereign who constitutes it? 2. Whether the subject was sub potestate of the sovereign whose courts condemned it ?
These circumstances have an immediate relation to the existence of the court, and of its power of acting upon the subject; but within its legitimate scope of action, the correctness of its proceedings, or of the rules of decision by which it is governed, cannot, in the nature of things, and consistently with the idea of perfect equality and independence, be subjected to the review of other courts. The decisions of such courts do not derive their effect from their abstract justice ; they are in this respect analogous *170 to the acts of sovereignty. They are universally conclusive, because nowhere subject to revision. Among nations, they are considered as entitled to the same validity as the decisions of municipal courts, within their respective territories, and preclude the rights of parties, although contrary to every idea of law, reason and evidence.
The court of St. Domingo being a court of co-ordinate authority with this, was equally competent to decide a question of jurisdiction arising under the law of nations. Had the question, whether a seizure under municipal law, upon the high seas, was contrary to the law of nations, or, if contrary to the law of nations, whether the court could not, therefore, exercise jurisdiction upon it, been brought to the notice of that court, it is presumed, that their decree would not have been void, because they maintained the negative of the proposition. Had it been made a question before that court, whether the laws of France authorized the capture of The Sarah, at ten leagues distance from the coast, or whether in fact the vessel was not seized within two leagues of the coast, it is presumed, that their decision upon these points would have been conclusive, whatever may be the impres*28fil s^on *0^ C01ir* Norn the evidence now before us. It is impossible for this court to pretend to a knowledge of all the facts by which the decree of that court may have been regulated. The decree itself shows that the whole evidence is not before us; but if it were, that court is sole arbiter, both of the effect of testimony, and the credibility of witnesses. A similar observation may be made with regard to the laws of France, which much pains has been taken to prove, did not authorize this capture. How can this court be supposed to know all the laws, sovereign orders or received principles which regulate the decisions of foreign courts. Such courts are best acquainted with the laws of their own government, and their decision upon the existence or effect of those laws must, in the nature of things, be conclusive in the eyes of other nations. Suppose, that other courts were so far at liberty as to review the grounds upon which such decrees profess to proceed, the insufficiency' of those grounds would not be conclusive against the correctness of such decisions, because they may be maintainable upon other grounds, not noticed, or even not known to the judge who pronounces them.
But if we are to look into the grounds upon which a decree is professedly founded, extravagant as that upon the case of The Sarah is said to be, there is one view in which it may admit of justification. General Ferrand, in his preamble, declares it to be his leading object to remove the contrariety of opinion which existed among the officers of government relative to existing laws, respecting captures of vessels taken upon the coasts of St. Domingo. If their judges thought proper to consider this arrdte as only declaratory of pre-existing laws, and that the words in the first article, “ oeux expedi'epow les portes en lew possession en sortant avec ou sans chargement,” authorized the capture of vessels outward bound, I know no reason that we can have to declare it a misconstruction or incorrect opinion, or, if incorrect, to nullify their decree on that account. The conclusiveness of a foreign sentence appears to be at an end, the moment other courts undertake to look into the cause for which a capture was made. If the possession of the captor is the *2871 Possession of his sovereign, and his courts have a right, therefore, * to adjudicate property captured, *or carried into a foreign port, it *171 appears to me, to be immaterial, on what ground the capture is made. The fact of dispossession by sovereign authority, judicially ascertained, deprives all other courts of the right to act upon the case.
Upon these considerations, I have adopted the opinion, that we are not at liberty to enter into the inquiry, whether the capture of The Sarah was made in pursuance of belligerent or municipal rights. But if we are to enter into the inquiry, I am of opinion, that the evidence before us plainly makes out a case of belligerent capture, and, though not so, that the capture may be justified, although for the breach of a municipal law.
In support of my latter position, both principle and the practice of Great Britain and our own government may be appealed to. The ocean is the common jurisdiction of all sovereign powers ; from which it does not result, that their powers upon the ocean exist in a state of suspension or equipoise, but that every power is at liberty, upon the ocean, to exercise its sovereign right, provided it does no act inconsistent with that general equality of nations which exists upon the ocean. The seizure of a ship upon the high seas, after she has committed an act of forfeiture, within a territory, is not inconsistent with the sovereign rights of the nation to which she belongs, because it is the law of reason, and the general understanding of nations, that the offending individual forfeits his claim to protection, and every nation is the legal avenger of its own wrongs. Within their jurisdictional limits, the rights of sovereignty are exclusive ; upon the ocean, they are concurrent. Whatever the great principle of self-defence, in its reasonable and necessary exercise, will sanction in an individual in a state of nature, nations may lawfully perform upon the ocean. This principle, as well as most others, may be carried to an unreasonable extent; it may be made the pretence instead of the real ground of aggression, and then it will become a just cause of war. I contend only for its reasonable exercise.
The act of Great Britain, of the 24 Geo. III., c. 47, is predicated upon these principles. It subjects vessels to ^seizure, which approach with certain cargoes on board, within the distance of four leagues of her L coast, because it would be difficult, if not impossible, to execute her trade laws, if they were suffered to approach nearer in the prosecution of an illicit design. But if they have been within that distance, they are afterwards subject to be seized on the high seas. They have then violated her laws, and have forfeited the protection of their sovereign. The laws of the United States upon the subject of trade, appear to have been framed in some measure after the model of the English statutes ; and the 29th section of the act of 1799, expressly authorizes the seizure of a vessel that has, within the jurisdiction of the United States, committed an act of forfeiture, wherever she may be met with, by a revenue cutter, without limiting the distance from the coast. So also, the act of 1806, for prohibiting the importation of slaves, authorizes a seizure, beyond our jurisdictional limits, if the vessel be found with slaves on board, hovering on the coast; a latitude of expression that can only be limited by circumstances, and the discretion of a court, and in case of fresh pursuit, would be actually without limitation. Indeed, after passing the jurisdictional limits of a state, a vessel is as much on the high seas, as if in the middle of the ocean ; and if France could authorize a seizure at the distance of two leagues, she could at the distance of twenty.
*172 But the capture of The Sarah may fairly be considered as an exercise of belligerent right, and strictly analogous to seizure for breach of blockade! The right of one nation to exclude all others from trading with her territories, exists equally in war and in peace. Had the exclusion, in this case, been merely calculated for the interests of trade, it may have been considered as purely municipal. But there existed a war between the parent state and her colony. It was not only a fact of the most universal notoriety, but officially notified in the gazettes of the United States, by the proclamation of the French resident, M. Pichón, who, at the same time, publishes the prohibition to trade with the revolters, with a declaration that seizure and confiscation should be the consequence of disobedience to this prohibi- * tion. Here, then, was notice of the existence of waz-, and an assertion -* *of the rights consequent upon it. The object of the measure was not the promotion of any particular branch of agriculture, manufacture or commerce, but solely the reduction of an enemy. It was, therefore, not merely municipal, but belligerent, in its nature and object. If France had a right to subdue the revolted colony, she had an undoubted right to preclude all nations from supplying them with the means of protracting the. war. To confine her to her own jurisdictional limits, in the exercise of those acts of foz-ee which were necessary to caz-z-y hito effect her right of excluding neutrals, would be a mere mockery, when, by the very state of things, she was herself shut out from those limits. Seizure on the high seas, for a breach of the right of blockade, during the whole z-eturn-voyage, is universally acquiesced in, as a reasonable exercise of sovereign power. The principle of blockade has, indeed, in modern times, been pushed to such an extravagant extent, as to become a very justifiable cause of war, but still it is admitted to be consistent with the law of nations, when confined within the limits of reason and necessity. The right to subdue an enemy, caz-ries with it the right to make use of the necessaz-y means for that puz-pose, and the individual who does an act inconsistent with the lights of a belligerent, exposes himself to the liability to be treated as an enemy. The belligerent nation can exercise the same acts of violence against him, that she can against an individual of her enemy. Nor can his sovereign protect an individual who has committed an aggression upon belligerent rights, without becoming a party to the contest.
The argument drawn from the decree of Ferrand, to pi-ove that France had not asserted her belligerent rights, is evidently founded upon a mistranslation. The sentence which authoi-izes the seizure of vessels, when outward bound, after having entered the ports of St. Domingo, is substantive, and totally unaffected by the subsequent sentence, which authorizes a seizure of vessels sailing within two leagues of the coast. The former authoz-izos capture for the offence of having entered those ports ; the latter, for being-found in a situation from which an intention to commit that offence shall be inferred. Nor, if the fact were so, that she had limited the l-ight of capture *290] to two leagues from her coast, would *it follow, that this was an ex-ez-cise of municipal right; because a nation may restrict her subjects, in the exercise of belligerent rights, to a certain distance from the coast, or even to her jurisdictional limits, and yet the chaz-acter of the seizuz-e would be in zzo wise changed. If the object of the seizure is to promote the reduction of an enemy, it is an exercise of the rights of war.
*173 From these considerations, I conclude, that the capture of The Sarah was justifiable upon principles not at all dependent upon municipal regulation ; that it may fairly be considered as haying been made in conformity with the law of nations, and therefore, without acdeding to the doctrine that a seizure, contrary to the law of nations, was a void seizure, and that we have a right to declare that a mere marine trespass, which a court of France has declared to be the act of its sovereign, I, conclude, that the court of St. Domingo had jurisdiction in this case ; and if it had jurisdiction, it is admitted, that the property was altered, and the libellant ought not to recover.
Let it be observed, that this is not an application on behalf of the vendee of the captor, for the aid of this court to secure to him the benefit of his purchase. We find him in possession, and the application is for our aid to divest that possession, and restore it to the original owner. This owner was clearly an offender against the rights of France, and his only claim upon the interference of this court is, that he had escaped, with the property thus acquired, beyond two leagues from the shore of the nation that he had offended. In such a case, it would be enough, for all the purposes of the defendant, if this court would imitate the state of our nation, and remain neutral between the parties.
Let it not be supposed, that the opinion which I am giving devotes the commerce of our country to lawless depredation. My observations are applied to a case in which an evident aggression has been committed, by entering at least two of the interdicted ports of St. Domingo. The individual who will knowingly violate the rights of war, or laws of trade, of another nation, is well apprised that he forfeits all claim to the protection of his country, or the interference of its courts. The peace of *the nation, and the interests of the fair trader, imperiously require, that the *- smuggler, or the violator of neutrality, should be left to his fate.
If I had no other reason to satisfy my mind of the correctness of the doctrines that I have been contending for, a conviction of their importance to the peace and security of the mercantile world would alone induce me to maintain them. The purchase of these goods was made in a Spanish port, under sanction of an agent of the French government, apparently countenanced by the government of the country in which he acted, and is sanctioned by a condemnation. If, in the purchase of articles of merchandise in a foreign -port, under the sanction of sovereign authority, it is nevertheless necessary, in order to acquire & good property, that a merchant should know whether they were captured by law, or without law, under the law of nations, or under municipal law, the office of a lawyer will be as necessary to his education as the counting-house. Articles of commerce, passing from hand to hand by mere delivery, often remaining for years in the same packages, distinguished by the same marks, may admit of identification, after any length of time, in the remotest countries, and in the hands of the most innocent purchasers. But if a seizure by a sovereign, upon a ground which any court may adjudge unsanctioned by the law of nations, is tantamount to no seizure, and nothing done in pursuance of it, can transfer a good property, where is the uncertainty to end ? With regard to ships, the inconvenience may not be so great. Every merchant knows that a vessel must be accompanied with her document papers, so that the purchaser may *174 come to the knowledge of her having passed through a capture and condemnation, and be put on his guard against so precarious a title. He will know that he is liable to be dispossessed, according to the varying construction of the law of nations that may prevail in different countries ; yet he knows the full value of a property thus embarrassed. But in the purchase of merchandise, he has no security, unless, indeed, he purchases them immediately from the manufacturer or the planter. It is a subject of curious speculation, how far the pursuit or research after merchandise thus situated may be carried; whether the same principle may not extend it into the *292] *hands of the retailer, or even the consumer.
In one of the cases arising out of the capture of The Sarah, I mean, that against Groning, the property is libelled in the hands of a purchaser, without notice, after it was landed in this country. If we can go so far, I see not where we are to stop. Every subsequent purchaser, even the remotest, so far as the article will admit of identification, is in no better situation than the defendant Groning, and liable, upon the same principle, to be dispossessed. After going beyond the fact of seizure by sovereign authority, within his own territory (where he is supreme), or upon the ocean (where he is equal to all others), unaffected by escape, re-capture or release (by which property is restored to its state before seizure), the approbatory sentence of his own court (by which alone it can be judicially known to be the act of the sovereign), beyond these limits, every step that a court takes, can only be productive of doubt, litigation and uncertainty, and involve the commercial world in endless embarrassment, at the same time, that it compromits the peace of nations, among whom it is a received and correct opinion, that a want of due deference to the jurisdiction of their maritime courts is a just cause of war.
Sentence of the Court, March 2d, 1808. This cause came on to be heard, on the transcript of the record, and on sundry exhibits introduced into the case in this court, and was argued by counsel, on consideration whereof, it appearing that The Sarah, with her cargo, were seized without the territorial jurisdiction claimed by the French government of St. Domingo, for the breach of a municipal regulation, and having never been carried within that jurisdiction, were sold by the captor in a foreign port, and afterwards condemned by the court of St. Domingo, as having violated the laws for regulating the commerce of French and foreign vessels with that colony, which laws authorize a seizuz:e of vessels found within two leagues of the coast; it is the opinion of the court, that the seizure of The Sarah and her cargo is to be considered as a marine trespass, not vesting the possession in the sovereign of the captor-, or *giving jurisdiction to the court which J passed the sentence of condemnation, and therefore, that the said sentence did not change the property in The Sarah vand her cargo, which ought to be restored to the plaintiffs, the original owners, subject to those charges of freight, insurance and other expenses which would have been incurred by the owners in bringing the cargo into the United States, which equitable deductions the defendants are at libezty to show in the circuit court. This court is, therefore, of opinion, that the sentence of the circuit court of South Caz-olina ought to be z-eversed, and the cause be z-emanded *175 to that court, in order that a final decree may be made therein, conform able to this opinion.[1]

 For a further decision in this case, see 5 Cr. 813.